ORTEGA, P. J.
*1027 *304 Petitioner Eugene Water and Electric Board (EWEB) seeks judicial review of a final order of the Public Employees Retirement Board (board), which determined that respondent Wigle became eligible for membership in the Public Employees Retirement System (PERS) six months after he began working at EWEB in a "temporary/contract position" and during which time he was paid through a third-party employment agency. EWEB asserts that Wigle did not become eligible for PERS membership until six months after his later hiring as a regular full-time EWEB employee. EWEB asserts two assignments of error: (1) that the board erroneously construed former ORS 237.011 (1981), renumbered as ORS 238.015(1) (1995)[1] as providing that a person employed by a public employer, but paid through a third-party employment agency, is "in the service of a public employer" and (2) the board failed to use the definition of "service" contained in its own rule- OAR 459-010-0003(1)(e)[2] -which did not exist during the period Wigle was working for EWEB in a "temporary/contract position." We reject EWEB's arguments and agree with the board's determination. We therefore affirm.
*305 The relevant facts are undisputed. Wigle began working for EWEB on November 1, 1982. EWEB employees interviewed Wigle and made the decision to hire him for what it considered a "temporary/contract position" to conduct residential energy audits and inspections. He reported to work at EWEB's offices and worked full time performing the same duties as the other regular full-time residential analysts/ inspectors. Wigle drove an EWEB truck, used EWEB office space and equipment, and used EWEB-created protocols to conduct the home audits and inspections. Further, Wigle was provided a badge and business cards that identified him as an EWEB employee. At the end of each week, Wigle would fill out a time card and submit it for approval to his EWEB supervisor, who would then forward it to Kelly Services, a temporary-staffing agency. Kelly Services would then issue Wigle's paychecks. That is, Wigle was "paid through" Kelly Services. Wigle's hourly pay was about the same as EWEB's regular full-time residential inspectors/analysts, but, unlike those employees, he did not accrue sick or vacation time, did not receive health insurance or other benefits, and did not make contributions to PERS. That arrangement continued until October 30, 1983, when Wigle left EWEB to work in another county. He returned to EWEB one year and four months later in the same position as before, and, on February 1, 1986, Wigle was hired as a regular full-time residential analyst/inspector with EWEB. Six months later, on August 1, 1986, Wigle was recognized as a PERS member, and EWEB began making contributions to PERS on his *1028 behalf. Wigle continued his employment with EWEB until he retired in 2011.
At some point, EWEB's legal counsel determined that PERS would likely treat Wigle as a PERS-eligible employee from his November 1, 1982 date of hire. Consistent with its counsel's advice, EWEB notified PERS that Wigle's start date should be changed to November 1, 1982, and PERS invoiced EWEB $6,442.30 for contributions and $33,953.40 for earnings on the contributions. EWEB paid the invoice. After the invoice was paid, however, EWEB obtained a second opinion regarding the eligibility dates for employees who, like Wigle, had worked for EWEB but were paid through a temporary staffing agency before becoming regular full-time *306 employees. That opinion was contrary to the first, and EWEB requested by letter that PERS correct its records to reflect that Wigle's start date to determine PERS membership eligibility was February 1, 1986. That letter asserted that, under ORS 238.015(1) and OAR 459-010-0003(1), Wigle was not "in the service of a public employer" until his 1986 hiring as a regular EWEB employee because he had been paid by a staffing agency before then. PERS accepted the correction and notified Wigle of its staff determination that, based on the change to his start date, his retirement benefits would be reduced by about $325 per month. Wigle appealed that determination notice to an administrative law judge (ALJ). For the administrative hearing, PERS reversed its position and adopted Wigle's contention that he was PERS-eligible as of May 1, 1983, six months after he began working for EWEB on November 1, 1982.
The ALJ viewed the issue as whether Wigle became eligible for PERS membership as of May 1, 1983 (six months after he began working for EWEB), or as of August 1, 1986 (six months after EWEB hired him into a regular position). For the ALJ, the issue turned on the meaning of the phrase "in the service of a public employer" as used in former ORS 237.011. The ALJ considered our case law concerning the meaning of "service" in another PERS statute, Aronson v. PERB , 236 Or. App. 17, 24, 236 P.3d 731 (2010) (construing "absent from the service" in former ORS 237.109(2) (1973) as "not working"), and construed former ORS 237.011 to ascertain the legislative intent under our usual methodology, PGE v. Bureau of Labor and Industries , 317 Or. 606, 610-12, 859 P.2d 1143 (1993), and State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009), concluding that the term "in the service of" means the same thing as "employment." The ALJ also determined that, under common law and PERS rules,[3] Wigle was an employee as of November 1, 1982, and was therefore entitled to PERS membership as of May 1, 1983 (upon completing his first six months' employment with EWEB). The board affirmed and adopted the ALJ's conclusions.
*307 On review, EWEB does not dispute that Wigle was an employee. Rather, EWEB argues, as it did before the board, that a two-pronged inquiry determines PERS-membership eligibility. That is, to be eligible, a worker must be an "employee," and also receive a "salary," defined in former ORS 237.003(8) (1981), renumbered as ORS 238.005(11)(a) (1995), in part, as "the remuneration paid an employe in cash out of the funds of a public employer in return for services to the employer." In EWEB's view, Wigle never received a "salary" under that definition when his paychecks were issued by Kelly Services because he was not paid "in cash out of the funds of a public employer." EWEB argues that the board's reasoning is "simplistic" in that it does not properly take into account the PERS statutory scheme and subsequent amendments to the PERS statutes as well as the board's administrative rules, namely, the definition of "creditable service," ORS 238.005(6), and the definition of "service" in OAR 459-010-0003(1)(e). According to EWEB, because employees of a public employer must contribute six percent of their "salary" to the Public Employees Retirement Fund under former ORS 237.071 (1981), renumbered as ORS 238.200 (1995), it "necessarily follows that work through a *1029 temp service, where the worker's salary is paid by the temp service rather than through the public employer's payroll, could not be a type of work that qualified as 'service' for purposes of PERS eligibility."
Respondents answer that "in the service of a public employer" means nothing more than the performance of work or employment for a public employer. Moreover, the board asserts that a person is PERS-membership eligible if the person performs work for a public employer for six uninterrupted months, former ORS 237.011, and the person does not fall within any of the exceptions set forth in the PERS statutes. Moreover, respondents assert, even if receiving a "salary" is a requirement of PERS membership eligibility, neither the PERS statutes nor Oregon case law provides that a salary be paid directly out of public funds.
Thus, the issue presented to us, as framed by the parties, is whether PERS membership eligibility depends on receiving a "salary," in addition to being an employee, and, if "salary" is a requirement of PERS membership eligibility, *308 whether the "salary" must be paid directly by the PERS employer. Thus, our task here is to ascertain what the legislature intended by the meaning of "in the service of" in former ORS 237.011, and we therefore employ the methodology of statutory construction set out in PGE , 317 Or. at 610-12, 859 P.2d 1143, and Gaines , 346 Or. at 172, 206 P.3d 1042. We do so by considering the text and context of the statute, as well as any legislative history that is useful to our analysis. Gaines , 346 Or. at 172, 206 P.3d 1042.
We begin our analysis by observing that membership in PERS is a "contractual benefit of public employment," Strunk v. PERB , 338 Or. 145, 157, 108 P.3d 1058 (2005), and, under former ORS 237.011, the contractual benefit of PERS membership begins "after a six-month period of employment with the PERS employer," Hughes v. State of Oregon , 314 Or. 1, 20, 20 n. 23, 838 P.2d 1018 (1992). Hence, it is former ORS 237.011 that governs, subject to specified exceptions (further explained below), the contractual right to PERS-membership eligibility.
As noted, the meaning of "in the service of a public employer" in former ORS 237.011 is central to the dispute in this case. That statute provided:
"No person may become a member of the system unless he is in the service of a public employer and has completed six months' service uninterrupted by a total of more than 30 working days during the six months' period. Every employe of a participating employer shall become a member of the system at the beginning of his first full pay period following the six months' period. All public employers participating in the Public Employes' Retirement System established by chapter 401, Oregon Laws 1945, as amended, at the time of repeal of that chapter, and all school districts of the state, shall participate in, and their employes shall be members of, the system, [with exceptions not pertinent here.]"
Former ORS 237.011 (emphasis added). Because "service" or "in the service of" was not defined in the PERS statutes, we turn to the ordinary meaning of those terms. See DCBS v. Muliro , 359 Or. 736, 745-46, 380 P.3d 270 (2016) ( "When the legislature has not defined a word or a phrase, we assume, at least initially, that the word or phrase has its 'plain, natural, and ordinary' meaning." (Quoting PGE , 317 Or. at 611, 859 P.2d 1143.)). Helpfully, we have already considered the plain meaning *309 of "service" in a statute contemporaneous with former ORS 237.011. In Aronson , we construed the phrase "absent from the service" in former ORS 237.109(2) (1973), renumbered as ORS 238.095 (1995),[4] to determine whether PERB erred when it recalculated the petitioner's PERS benefits by not crediting the years the petitioner was working less than 600 hours a year. *1030 Aronson , 236 Or. App. at 23, 236 P.3d 731. In doing so, we looked to the ordinary meaning of the term "service," which was defined as " '[p]erformance of labor for the benefit of another, or at another's command' and '[p]erformance of official duties for a sovereign or state; official function.' " Id. at 24, 236 P.3d 731 (quoting Webster's New Int'l Dictionary 2288 (2d ed. unabridged 1950). From that definition, we stated that, as relevant to former ORS 237.109(2), "service" meant performance of labor-or more plainly "work." Moreover, the phrase "absent from the service" meant "not working." Id. (emphasis in original). We also noted that "other statutes enacted in 1953 consistently conflated the term 'service' with the concept of employment ." Id. (emphasis added) (noting, for example, that the definition of the term "continuous service" in former ORS 237.003(2) (1953), renumbered as ORS 238.005(3) (1995), partially provided that that term must be "computed without regard to interruption in the case of *** an employee who had returned to the service of his employer as of January 1, 1945, and who remained in that employment until having established membership in [PERS]" (emphasis in original)).
That understanding of "service" in the term of "absent from service" holds just as true here: Given the common understanding that "service" meant "working," or in the context of the PERS statutes, similarly meant "employment," we understand "in the service of a public employer" to mean "in the employment of a public employer." Thus, we begin with the initial proposition that, generally, PERS-membership eligibility turns on employment with *310 a public employer once the six-month waiting period is completed.
With that in mind, we disagree with EWEB that former ORS 237.071 established that "in the service of" necessarily includes the payment of "salary." Former ORS 237.071(1)(a) provided that "[e]ach employe who is a member of the system shall contribute to the fund and there shall be withheld from salary of the employe six percent of that salary." That provision, however, was a requirement of PERS public employers and PERS members for whom eligibility had already been met. Stated differently, although it necessarily follows that PERS members and their public employers were required to satisfy the contribution requirements under former ORS 237.071, the opposite, which is that failure to make the requisite salary contribution negates PERS-membership eligibility, does not necessarily follow.[5]
Importantly, the defined term EWEB argues is a requirement for PERS membership eligibility-"salary" under former ORS 237.003(8) -is absent in former ORS 237.011, which as noted, was the key provision governing PERS-membership eligibility. Former ORS 237.011, however, does include a defined term-"employe"-that supports a legislative intent concerning PERS-membership eligibility that goes against EWEB's position. The second sentence of former ORS 237.011 provides that "[e]very employe of a participating employer shall become a member of the system at the beginning of his first full pay period following the six months' period." The legislature provided for exceptions to that broad mandate. Former ORS 237.003(4) (1981), renumbered as ORS 238.005(5) (1995), defines "employe," in relevant part, as follows:
"The term 'employe' includes, in addition to employes, public officers, but does not include:
"(a) Persons engaged as independent contractors.
*311 "(b) Seasonal, emergency or casual workers whose periods of employment with any public employer or public employers do not total 600 hours in any calendar year."
In addition to those exceptions (neither of which affected Wigle), former ORS 237.011 itself has a number of exclusions or conditions concerning PERS-membership eligibility. See, e.g. , former ORS 237.011(1)(a) (providing that employees who were members of *1031 a public employer's retirement system established prior to April 8, 1953, were not eligible for PERS membership unless the previously established system was integrated in accordance with a statutorily provided procedure); former ORS 237.011(2) (excluding those public employees who change employers and opt to relinquish membership and join a separate retirement system). Hence, the legislature provided for PERS-membership eligibility to a general class of persons-employees working for public employers participating in the PERS system who have been employed for six months-and expressly carved out exceptions to that general requirement. We assume that, because the legislature knew how to create exceptions to its broadly worded statute, the fact that it could have and did not create an exception for an employment relationship during which an employee is paid through an intermediary strongly suggests that "employe" includes a person subject to that kind of employment relationship. See, e.g. , Waddill v. Anchor Hocking, Inc. , 330 Or. 376, 382, 8 P.3d 200 (2000) (in applying the "maxim of inclusio unius est exclusio alterius ('the inclusion of one is the exclusion of the other')" at the first level of interpretative analysis, concluding that the specification of the three times a party may raise a defense indicated an intent to make the defense otherwise unavailable).
Even if "salary" did inform what was required for PERS-membership eligibility, we are not persuaded by EWEB's assertion that "salary" cannot be paid through an intermediary such as a staffing agency. Again, former ORS 237.003(8) defines "salary" as
"the remuneration paid an employe in cash out of the funds of a public employer in return for services to the employer, plus the monetary value, as determined by the Public Employes' Retirement Board, of whatever living quarters, *312 board, lodging, fuel, laundry and other advantages the employer furnishes the employe in return for services."
We understand that definition of "salary" to include two important concepts. First, the definition of "salary" reflects the reciprocal nature of the employer/employee relationship-public employees work for public employers in return for payment, both monetary and nonmonetary. That the payment is delivered through an intermediary does not alter that fundamental concept of salary. The difficulty of EWEB's position is that its employment relationship with Wigle embodied that concept-Wigle was ultimately paid out of EWEB's funds in return for the services that he provided as an employee to EWEB. Second, because the definition includes not only money paid to an employee as the quid pro quo for the work provided to the employer but also the monetary value of other benefits that are provided to the employee in return for the work provided to the employer, it is a definition that expands what a salary might ordinarily be understood to mean-monetary pay. Certainly, we do not understand the legislature to have intended the definition as a provision that restricts the meaning of "salary" for purposes of calculating the contribution to the PERS fund as required by former ORS 237.071.
EWEB also asserts that the board "disregarded current law" because it failed to take into consideration two later-enacted PERS provisions. The first is the legislature's 1993 amendment to the PERS statutes that adopted a definition for "creditable service," ORS 238.005(6), as "any period of time during which an active member is being paid a salary by a participating public employer and for which benefits under this chapter are funded by employer contributions and earnings on the fund." (Emphasis added.) The second is OAR 459-010-0003(1)(e) (Feb. 22, 2005), which defines "service," for "purposes of this rule," as a "period in which an employee [i]s in an employer/employee relationship *** and [r]eceives a payment of 'salary ' ***." (Emphasis added.) Both provisions, however, even if we were to consider them relevant to our analysis of what statutory provisions controlled as of 1982 through 1986,[6] depend on EWEB's *313 contention that *1032 "salary" is payment for services rendered directly from a public employer to an employee. We have rejected that premise, and for that reason, we reject EWEB's arguments concerning those provisions.
We therefore conclude that an employee working for a public employer participating in PERS who is paid through an intermediary is eligible for PERS membership. We affirm the board's order, which determined that Wigle's employment began on November 1, 1982, and that he became entitled to PERS membership on May 1, 1983.
Affirmed.

Former ORS 237.011 (1981) provided:
"No person may become a member of the system unless he is in the service of a public employer and has completed six months' service uninterrupted by a total of more than 30 working days during the six months' period. Every employe of a participating employer shall become a member of the system at the beginning of his first full pay period following the six months' period. All public employers participating in the Public Employes' Retirement System established by chapter 401, Oregon Laws 1945, as amended, at the time of repeal of that chapter, and all school districts of the state, shall participate in, and their employes shall be members of, the system, [with exceptions not pertinent here.]"
In 1995, the PERS statutes were moved from ORS chapter 237 to ORS chapter 238 and renumbered. Subsequent references to former ORS 237.011 (and other ORS chapter 237 statutes, unless otherwise noted) are to the 1981 version of the statute.

OAR 459-010-0003(1)(e) defines "service" as
"a period in which an employee:
"(A) Is in an employer/employee relationship, as defined in OAR 459-010-0030 ; and
"(B) Receives a payment of 'salary,' as defined in ORS 238.005 or similar payment from workers compensation or disability."

Under OAR 459-010-0030, PERS adopted the 20-factor test described in Internal Revenue Service Ruling 87-41 to determine employee status.

Former ORS 237.109 provided, in part, that
"An employe shall cease to be a member of the system:
" * * * * *
"(2) In the event that he is absent from the service of all employers participating in the system for a total of more than five consecutive years after he becomes a member of the system[.]"

In this case, we observe that the six-percent salary contribution was not made while Wigle was paid through the staffing agency but later, when the contribution, and earnings on the contribution, were retroactively imposed on him and EWEB. Thus, as a practical matter, it is possible to satisfy the requirements of former ORS 237.071 retroactively despite not having originally viewed an employee as eligible for PERS membership.

We are limited to considering the version of the statutes that was in effect during the relevant time period at issue concerning Wigle's PERS eligibility. See Riemer v. PERB , 258 Or. App. 665, 669, 310 P.3d 1181, rev. den. , 354 Or. 656, 318 P.3d 1144 (2013) ("We consider the version of those statutes that was in effect in 1982, when petitioner elected to become a PERS member."). EWEB's contention that we are not so limited relies on cases in which Oregon appellate courts have looked at later-enacted statutes "to the extent that they demonstrate consistency (or inconsistency) in word usage over time or as indirect evidence of what the enacting legislature most likely intended." State v. Ferguson , 261 Or. App. 497, 323 P.3d 496 (2014) (citing Halperin v. Pitts , 352 Or. 482, 490-91, 287 P.3d 1069 (2012) ). In this case, the link in meaning between the later-enacted definition for "creditable service" and the phrase "in the service of a public employer" is too tenuous to aid our understanding of the legislature's intent. That is, the fact that both have the word "service" in them does not persuade us that the terms are similar enough in meaning to allow us to better discern the legislature's intent when it enacted former ORS 237.011 and the phrase "in the service of a public employer." Importantly, as the board points out in its briefing, the definition of "creditable service," applies after a salary is paid to an "active member," indicating that "creditable service" applies when PERS membership has been established, rather than providing an additional requirement for establishing who and when a public employee may be become a PERS member.
As for OAR 459-010-0003 (Feb. 22, 2005), even if the rule was contemporaneous with the time period at issue, our function on review is an interpretation of the relevant statutory provision, namely former ORS 237.011, for legal error and not the board's interpretation of an administrative rule. That the rule put forth by EWEB was promulgated about 20 years after the disputed time period and even decades longer than the enactment of former ORS 237.011 in 1953 makes it even less relevant to our analysis.